## THE QUEVILLY.

### (District Court, E. D. New York. September 23, 1918.)

COLLISION &#9737;&rarr; 81—MOVING AND ANCHORED VESSELS—ENTERING ANCHORAGE GROUND IN FOG.

A bark turning into the anchorage grounds on the Staten Island side of the Narrows in a dense fog, without giving more frequent fog signals to give warning of the movement, *held* solely in fault for collision with an anchored vessel sounding signals at regular intervals.

In admiralty. Suit for collision by the Norton-Crossing Company against the French bark Quevilly. Decree for libelant.

Robert Strange, of New York City, for libelant.

Kirlin, Woolsey & Hickox, of New York City (Robert S. Erskine and L. De Grove Potter, both of New York City, of counsel), for claimant.

CHATFIELD, District Judge. At about 9 a. m. on the morning of February 18, 1916, the Quevilly was proceeding up through the Narrows, when it became evident that the fog made it unsafe for her to proceed further, and she sought an anchorage. She had been sounding a fog horn and heard fog bells from vessels at anchor on the Staten Island side. From these the Sandy Hook pilot endeavored to locate an open space into which he might proceed within the anchorage lines along the Staten Island shore. The testimony shows that he passed a steamer whose bell was plainly heard, and that he heard no bells above this steamer, from which he inferred that he could safely turn in at that point. The tide was running flood, and he starboarded his helm to pass under the stern of this steamer. He then ported his helm to turn against the tide, when the Urann was sighted practically dead ahead. He starboarded sharply again, and succeeded in almost clearing the Urann, but caught the jib boom with some portion of the mizzen rigging of the Quevilly. At just this time a tug was coming out from the Staten Island shore in search of the Urann, being guided by the sound of the Urann's fog bell, and the captain of the tug called to the Quevilly to go astern, and to drop anchor in order to avoid running into the Indra, which was lying directly in the path of the Quevilly and inshore of the Urann. Just at this moment the pilot of the Quevilly brought his ship to anchor, and she was stopped so near the Indra that, as she swung to the tide, her stern carried away the bobstay of the Indra. The Quevilly had previously stopped her engines, but started ahead again just as she made the turn into the anchorage grounds. She was moving, according to the testimony of the witnesses, at about a two-knot speed, but was evidently drifting sideways with the flood tide more rapidly than the pilot estimated. He testified that he heard no bell from the Urann or any other boat further up the harbor.

The testimony of witnesses whose statements are entirely dependable, and are in no way contradicted, shows that the bell of the Urann was ringing at frequent intervals, and that other boats in the imme-

diate vicinity and further up the harbor were also ringing bells, and it is apparent that the Sandy Hook pilot's recollection of whether he heard bells, and at what distance, must be at fault. It would appear that the side drift of the Quevilly, when making the turn into the anchorage ground, brought him too close to the Urann, and that he had probably paid no attention to the Urann's bell, on the assumption that it was not within dangerous proximity.

There is testimony that none of the persons on the Urann, or on the tugs alongside, heard the whistles of the Quevilly, and this bears out the theory that, when the Quevilly began to turn in, she was not close enough to the Urann to attract attention, so as to indicate that she was coming out of the channel.

There is also evidence that the Urann was observed by one of the inspectors of the anchorage at a point just outside of the anchorage boundaries; but this does not enter into the case, for the Sandy Hook pilot was navigating by sound, and if the Urann was, at some conditions of the tide, swinging outside of the anchorage line, it did not enter into the causes of this collision. The Quevilly had already turned inside of another boat, and was straightening up to come to anchor before reaching the Urann.

The burden was upon the pilot of the Quevilly (when leaving the channel and running into the anchorage ground, where he knew that vessels were likely to be met) to estimate correctly the various matters which had to be taken into account. The burden was therefore upon him, either to avoid running into any boat which might be encountered, or to indicate by more frequent fog signals the movements of the Quevilly. If he had done this, the attention of the mate ringing the bell of the Urann, and the attention of the other boats in the vicinity, might have been attracted in such a way that they would increase the frequency of their own fog signals, and the Quevilly might thus have avoided the danger in time; but there is nothing in the case to indicate that the Urann was negligent, when lying either on or very close to the anchorage ground, and when sounding its bell at regular intervals, in not anticipating that a boat would come in from the channel and run her down, without sounding its own approach by more frequent signals than the regular fog horn at stated intervals.

The libelant may have a decree.